We'll call Torshin v. Attorney General of the United States. Ms. Farinacci? Good morning, Your Honors. May it please the Court, Andrea Farinacci, my colleague Stacey Schweizer, on behalf of Petitioner Valerie Torshin. And you have already reserved four minutes for rebuttal, is that correct? Yes, Your Honor. There are two issues in front of this Court today. One, whether the BIA abused its discretion in denying Mr. Torshin's motion to reopen in order to seek a claim under the United Nations Convention Against Torture, or CAT. And two, whether Mr. Torshin was denied a full and fair hearing in front of the immigration judge. We believe this Court should find an affirmative on both these issues. With respect to the BIA's abuse of discretion in denying Mr. Torshin's motion to reopen, we believe their opinion was arbitrary, irrational, and contrary to law. First, Mr. Torshin did, contrary to the BIA's opinion, establish prima facie eligibility. He did this through the production of objective evidence showing a reasonable likelihood that he could succeed on a CAT claim if given the opportunity to do so. That's based on the execution that he witnessed by the agents? Correct. And there was no adverse credibility finding by the IJ or the BIA? Correct, Your Honor. And in fact, he did. And I think with the BIA, where it's sort of the flaws in the BIA's analysis is that they said that he only alleged the torture by corrupt individuals. And as you explained in this KGB incident, he actually did show the link between government officials and the act of torture. In that he was driven to a KGB facility, he was transported in a KGB car with his bodyguard. They were taken to a remote area where they were forced to witness the brutal killing of another man and then threatened that same fate. So your position is that the potential for or probability of future torture is based on that single event that occurred in Belarus prior to his obviously coming to this country? No, I would submit that that event rose the level of torture. I understand that. And the definition of torture begins by simply an act. So that's your single act. But what it is is an historical event. So that any fact finder is required to extrapolate from historical events to determine some whatever measure of probability, more likely than not. Is that what's applicable here? I've forgotten. Yes. The prospect is of future torture. Well, I think Mr. Torshin established that for the probability of future torture in his submissions and explanation of press camera, which is the threatened, directed torture when he is removed to Belarus and will be detained, that he will be at the direction of the prison officials, subject to severe torture and repeated raping by these. But there isn't anything in the record to suggest that those prison officials, whomever they might be, are the same people who were involved with the act of execution that he was forced to witness. No, but the KGB officials that did force him to observe that act have the ability to instruct these prison officials to. Is that in the record? Not that exact link, but I believe that the prison officials do constitute government actors or at least create that nexus to the possibility of future torture should he be removed and detained in Belarus. Well, all you have to do is a real possibility that he's going to be that this could be repeated if he doesn't do whatever the KGB officers tell him to do for a crime of facial case. Correct. He just has to prove a reasonable likelihood that he could, if given the opportunity, he could give him the opportunity to present all his evidence. And all his evidence is not in the record because he didn't even have the opportunity to present evidence under this cat claim. It was not available to him. And what the record demonstrates is facts and based on asylum. This has nothing to do with the asylum claim or any claim for asylum, just torture. Exactly. It's a separate and distinct claim. And there has been a claim that he's not, that this is a fairy tale, that he's been found, in effect, found credible. He has been found credible by the IJ. By not making an adverse credibility finding. Exactly. And the IJ actually never, you know, like we said, there was no adverse credibility. It's not that they didn't even find persecution or torture. It was the IJ said there just isn't a link to that protected ground. He couldn't make that link that based on his protected, his membership in a protected class or his political opinion, there was no link there. Well, in the cat claim, he doesn't have to make a link between the torture and any political protected ground. Correct. He just has to establish a reasonable likelihood that he could succeed on a cat claim or that he could prove more likely than not that he would be tortured upon removal to Belarus. Has he proved that by showing this one, if it's true, drastic incident that occurred to him? Is that sufficient for a prima facie case, you think? Well, I think that could be sufficient. That will happen if he goes back. Yeah. Yes, I think that is enough. But I think he also, in addition to this past incident of torture and the likelihood that he would be tortured as in the press cameras upon his arrival, but I think he also proved it through or there's at least enough evidence to merit him that opportunity to bring cat in the country conditions. Through the State Department, country reports, through Amnesty International reports, that torture still to this day is very prevalent in the prison systems and that there is a likelihood that he would be tortured if sent back. Well, Ms. Farinacci, one omission in the record that concerns me is that torture is not simply the act itself, as has been described here historically, but what it requires is a prolonged period of mental pain or suffering, correct? Correct. There's nothing in this record to even demonstrate, is there, that what Mr. Turchin experienced after the event that he testified to here and that it apparently is determined to have occurred because there is no adverse credibility, that that resulted in mental pain or suffering over a prolonged period of time, is there? I mean, there's certainly no expert testimony, but I don't even remember any testimony from him that it had that kind of effect on him. Well, I would respectfully disagree and say that he did suffer prolonged mental suffering and that there is evidence of this in the record and that after he was- What is it? That's really what I'm asking. He did suffer the effects of a heart attack. Uh-huh. And the days after, it was not even- Immediately after. Immediate- Was that prolonged? That was prolonged because it was days after, as I believe is in his application for asylum and in all his briefs in the record, evidence that he suffered this over numerous days, was unable to leave the house. This all happened July 21st of 1996, and he was here in the States August 3rd, 1996, so fearful and had suffered so much in those two weeks to- he didn't stay without incident for months or years. He came immediately and fled because it was so- the torture was so severe and the threat was so likely. Let me ask you, why can't it be torture just to be subjected to the thought, if it's credible, that if you don't shape up or give money or bribes, that- why is it torture that you could be shot dead? It's torture because it was mental suffering. Why is that sufficient? Just to say, you know, you're not going to be strung out for weeks or constantly hit or something. It's torture to know that you're going to be shot dead. You're not going to be extended, you know, hurt for a long period of time. Wouldn't that be sufficient torture? That is sufficient, and he was. That rises to the level that mental infliction of pain or suffering did rise to the level of torture because it was the result of imminent death. Why don't you turn to the asylum application, or what time is running out? I speak only for myself because I don't think this was the best-tried case that the IJ ever tried, in my view. But didn't everything get its opportunity to be heard, even though it may not have been exactly what would be called a very clean trial? No, I think there were numerous portions of Mr. Torshin's affirmative case that was not- he was not allowed to bring, and therefore was not incorporated or becoming part of the record. The IJ said he read the affidavit, and he asked him after everything has been said, do you have anything else to add? Well, first of all, he didn't explain the hearing at the outset. He did say- What do you mean he didn't explain the hearing? He didn't explain it adequately enough. He did say- Will you please point to one failure to explain a procedural right or any other provision of statute or regulation that was not covered here by the IJ, like the right to counsel, the existence of organizations that can provide counsel? What provision of statute or regulation can you point to that this IJ failed to adhere to? He did not offer Mr. Torshin the ability to designate an alternative country of removal. That would be one, 1253A. Well, that's only raised on appeal. That was not raised below. That was not raised in the BIA. You've waived that. Well, I don't think we have waived that. I think he did identify that in his appeal, saying that there were procedural due process. There are violations, and that constitutes a violation of due process. Yeah, but he never raised that he was not given the opportunity to designate the country of removal. If you don't raise specific issues on appeal, we've got a history of not hearing anything that you didn't bring before the BIA. I would agree with you in most circumstances. However, this was a pro se petitioner, and he did- At certain points. At certain points, yes. But I think while he did not say did that affect those exact words, he did say that there were procedural defects. In his motion to the BIA, though, in the motion to reopen, he did address that issue of not being afforded to designate an alternative country of removal. I see my time is up. The big problem I had with this is, and I'm not too happy with the way it was tried. I've got to acknowledge that, is that there's nothing that you put forward that if given the opportunity, the other evidence that he would have, if the judge would have given him a good lecture as to what the law was and if he gave all the time in the world, there's nothing in the briefs that indicates, which we only see all the time, if I had known, if they didn't do this to me, I would have had this evidence and I would have had that evidence. He didn't put forth any evidence that he would have used before the IJ if it had been a clean trial. Let's put it that way. Well, I think he did, and I think he says that had he been able to put on his own case and his own affirmative testimony, he would have clarified issues. One being, like he mentions in his appeal to the IJ, that he would have clarified the issue of the blinding lights and being able to write down the license plate of the car that ran him off the road where the IJ makes a point in his opinion of saying we can't reconcile this. How did this happen if he's blind and he writes this down? We just, there's just, we're not sure. And he says, well, if I had been able to put in testimony, I could have told him that I wrote down the license plate after the event had taken place. So there was things he could have proven, but most importantly, he could have, had he understood, which we saw there was a failure for him to understand what it was he needed to prove, he could have put in that evidence showing the link between persecution based on his protected membership in a group. And he was unable, due to the procedural effects in the original IJ hearing, to put in such evidence. Thank you. We will hear your colleague on rebuttal, and at this time we'll hear from Ms. Bosk. May it please the Court, Ada Bosk on behalf of the Attorney General. I want to start with just some basic background information that relates to the due process claim, and then I'll address the CAT claim if it's okay with the Court. Mr. Torchin filed an asylum application with the Immigration and Nationalization Service. During that time period, he was represented by counsel. His claim was for political, he alleged he was persecuted on account of political opinion, that being that he had been asked to pay roofs and he had refused to do so. And he asked, and he claimed persecution on account of membership in a particular social group, and that was his sexual orientation. That claim was denied by an asylum officer, and it was referred to an immigration judge. As the Court of knows, after several days of hearings, the immigration judge denied his request for asylum, finding that really what Mr. Torchin was complaining about was that he was a successful businessman and people were trying to get money from him. Let's stop at that several days of hearing, because without challenging my colleague, Judge Cowen's characterization is not exactly a clean trial. This seemed to me to be one of the more indulgent IJs I've seen in terms of the scheduling of hearings. There were several continuances, and there were continuances granted to allow further development of the record in this case. Were there not? That's correct, Your Honor. Mr. Torchin first appeared before an immigration judge in July of 1998. At that point, he was advised about his right to counsel and given a list of free services. He appeared again in October of 1998, and at that point elected to go forward without counsel. He did not have a copy of his background material, so the immigration judge copied, and the court has looked at the record, a voluminous application and sent it to Mr. Torchin so he would be prepared to go forward with his asylum application. They had a hearing before the immigration officer, and I disagree. The immigration judge did explain to Mr. Torchin the process through which he would be able to present his claim, and it's not evident from the record that Mr. Torchin had any misunderstanding of what the process was going to be. As the court noted, toward the end of the first full hearing date, Mr. Torchin advised the immigration judge that he had expected to have a witness present in support of his claim, and that witness was not present. So the immigration judge continued the hearing to allow Mr. Torchin an opportunity to present that witness, and at the conclusion of at least the hearing portion of the proceedings, he asked Mr. Torchin whether there was anything else he wished to add, and Mr. Torchin did. Subsequent to that, Mr. Torchin provided yet another volume of documents that related to more of his political opinion claims. This is, as the court has noted, an immigration judge that really gave Mr. Torchin ample opportunity to present his claim, and Mr. Torchin's claim boils down to that. He was very well-educated, a successful businessman who ran afoul of individuals who wanted to get money from him, and he refused to give them money, and that was the source of his problems. On appeal, Mr. Torchin was represented by counsel, and the only issue regarding due process that was raised, and we disagree that it's sufficient for any adjudicated body for somebody to argue there's due process violations, and that to be sufficient. Now, Mr. Torchin, in his appeal, where he was represented by counsel, pointed to one alleged error, and that was his contention that there was a translation error that led him to misunderstand what his burden of proof was. The board considered that when it considered his appeal, and it found the immigration judge complied with the regulatory requirements that are set forth in 8 CFR 1240.10 and 11, and significantly those regulations identify when an immigration judge is obligated to inform an alien of what the standard, what the burden of proof for an asylum claim is, and it does that when the asylum application is first presented to the immigration judge, and there's a reason for that. Once, as here, Mr. Torchin's claim was first presented to an asylum officer, and at that point he was represented by counsel. So the asylum claim before an immigration judge is really his second fight at the asylum apple, and at that point he has been informed of his burden of proof by the asylum officer, and in this case by his counsel. So there's no regulatory requirement for the immigration judge to again reiterate what his burden of proof was. Anyway, that was the only issue that Mr. Torchin raised in his appeal of the immigration judge's denial of his asylum claim. The board found that the immigration judge had complied with all the regulatory requirements and further found that Mr. Torchin had not established persecution that would warrant asylum and or withholding of removal. Mr. Torchin from there appealed to- That's the March 2002 decision of the BIA. Correct, and right. And Mr. Torchin appealed that decision to the district court through a Winnipeg-based corpus, and significantly, again, the only due process issue that was raised there that is raised here before this court is again this alleged error in translation. So our position is the remainder of Mr. Torchin's claims have not been exhausted. His due process claims, let me just add that caveat, have not been properly exhausted. He did raise in his motion to reopen an additional due process claim, but at that point, a motion to reopen is supposed to be an opportunity to present new facts, arguments that were not- facts that were not previously available or obtainable. And obviously, the conduct of the immigration proceeding is not a new fact. It's not something that was previously unobtainable, and that's not an appropriate avenue for contesting- a motion to reopen is not the appropriate avenue for contesting that. So our position is that the remainder of Mr. Torchin's claims, due process claims, have not been properly exhausted. Having said that, though, Mr. Torchin did receive a meaningful opportunity to present his claim, which is the other due process claim that he argued for the reasons that I described earlier. The other issue that he raised in his motion to reopen was- Let me answer you on the asylum claim. Could we have here a dual motive situation? He was found to be credible, and he claims- I mean, it's sort of- there's evidence that they harassed him because he was a successful businessman, and wanted to shake him down. But there's also his claim that they were doing it because he was a homosexual or his political group. So why can't we look at this as like in employment law, that there's a dual motive here, and they're doing this to him not only for purposes because they could get money from him, but also because he's a homosexual. Sure, and I can address that also sort of in the context of the CAC claim, because the CAC claim is based on his experiences in Belarus and the efforts at extortion. Mr. Torchin was not- first of all, Mr. Torchin said he did not actively participate in an opposition party. If you look at the abundant background material that Mr. Torchin provided, that really is where the Belarus government is involved. They are not particularly tolerant of political opposition groups. But Mr. Torchin was not a member of an opposition group. What he represented to the immigration judge was that his political opinion was different than the government's, but that he didn't find a party that meshed with his ideas, and so he never joined the political party. Anyway, the efforts at extortion were not- there's no testimony, there's no record evidence, that the efforts at extortion were meant to stop him from believing his political opinion or from joining any political opposition group. The efforts at extortion are, and Mr. Torchin candidly admitted, were because he was a successful businessman and they wanted to get money from him. Well, you can look at it- you know, it depends on how you want to look at it. You can look at it either way. You can look at it they were doing it because he was a homosexual or because he was a successful businessman or they didn't like his political stripe. I mean, it's all there in the record. That's why I say you have a dual motive situation here where a reasonable fact finder can say, well, they did it to him because he was a homosexual and had a girlfriend. Well, we can disagree that the record supports anything other than they wanted to get money from him, but even if there were some evidence in this record that the court could read that way, the standard that would have been had Mr. Torchin challenged his asylum, and it is the standard for his torture claim, is that it compels this court to find that there was another motive for the extortion efforts beyond getting money from him. The only time that his sexual orientation comes into play is as a method of getting money from him. That is, they threatened to disclose or out him out in an effort to get him to ultimately pay the roofs. And Mr. Torchin uses the term roof, which is, we believe, significant because the whole purpose of this is, as I said, to get money from him. So it is in their interest for Mr. Torchin to remain a successful businessman in order to get money from him. But if the court looks at the, as I said, the voluminous background materials, the discussion, the material that relates to political opinion, again, deals with people who are active participants in a political opposition group and or have participated in mass demonstrations. Mr. Torchin doesn't fit into either of those categories. Let me grant you that, but that doesn't help you with the Kat claim. Let me ask you a series of questions on the Kat claim, and I'm going to ask you to assume, let's assume that if the Kat claim had been litigated, there was substantial evidence under our very deferential standard of review, let's assume that there was substantial evidence in the record for the IJ and or the BIA to find that this did not rise to the level of torture. So let's assume that. But what happened here was the BIA explained to us why it denied the motion to reopen because he did not make out a prima facie case under the Kat, correct? Correct. And we need to take, under Cheddary, right, we need to take the BIA at its word. Correct. And I've got some issues with some of the things the BIA said. For example, the BIA noted that Torshin only alleged, quote, a fear of corrupt individuals and the conditions of confinement, including the treatment he could potentially receive from fellow inmates. Now, if that's true, he loses. But I'm not sure that's true because isn't it a fact that in the record, he didn't merely allege a fear of corrupt individuals, but rather he alleged a fear of the government, namely in the form of the KGB. Well, if I could back up for a second. Yes, that Mr. Torshin did allege that it was KGB officials that threatened him at the very end in 1996. That does not translate into government action. And the reason for that is, and there are several recent cases that deal with whistleblowers and sort of make this distinction more apparent, and that is that these are corrupt individuals. But they're government. There's a difference between just random criminals. I mean, this is the arm of the government running the prisons in Belarus, and these are just his allegations. We're not talking about him winning. We're just talking about him getting a chance to press this claim. I think the case would be different if the record that Mr. Torshin supplied showed that this type of political corruption was so prevalent that the government either was an active participant in or could have acquiesced into it. But there's nothing in the documentation that Mr. Torshin submitted that shows that political corruption is so significant. But he doesn't need to show that in the documentation. He needs, as I understand it, he's come forward, and I may be wrong on this, and help me if I am. He has said, if I'm shipped back to Belarus, these guys are going to throw me in a prison. And he's not arguing about poor prison conditions like we've seen in August or the Haiti cases. He's arguing that when he gets shipped back, other inmates under the control of the government will rape him. Why has he not articulated a fear of torture upon being returned to that situation? Well, Mr. Torshin's claim comes up in the context of a motion to reopen. So he had to show that there, and counsel said it correctly, a reasonable likelihood that he would be able to show that it is more likely than not that he would be tortured. If the court looks at the case of Zubida, there was a past experience, and then there was background material that supported that showed that this was so prevalent that it was sufficient to get past that more likely than not hurdle. But that's not what the BIA said. The BIA said he's merely challenging conditions of confinement. What I'm suggesting is that he challenged much more than his conditions of confinement. He made specific allegations that he will be raped by the government when he returns to prison. How do you square, I guess what I'm asking is, I'm not asking you to tell me whether that's true or credible. I'm asking you how do you square his allegation with the way the BIA characterized his allegations? With regard to the conditions of confinement, I think what the, and I see my time is almost up, but the conditions of, thank you, the conditions of confinement, what Mr. Torshin alleged is that these KGB agents were going to be able to get a prison official or somebody in prison to rape him and various other things. But the underlying evidence, aside from his blanket statement, does not support that. There's nothing for the board to say, okay, this happens often enough that this really is something that we need to have a minute here and ask. Right, I'm with you on that. The BIA could have said on these facts we find him credible, but on these facts we don't find that there's a reasonable probability of a likelihood of torture upon his return. But instead of saying that, the BIA said he's challenging conditions of confinement. So aren't we sort of, I guess what I'm asking is, it seems like a technicality, but didn't the BIA botch this the way, we need to take the BIA at its word. It seems to me that they've mischaracterized the record when they said that all he did was claim mistreatment by corrupt individuals and conditions of confinement. Let me, the way Mr. Torshin raised his, in his motion to reopen, Mr. Torshin largely argued ineffective assistance of counsel. And the board first and foremost addressed that, that it would not have been effective assistance of counsel because Mr. Torshin wouldn't have been prejudiced by that because he didn't articulate a viable CAT claim. And then describes, rephrases Mr. Torshin's CAT claim. And then it says in the final sentence, reading his motion to reopen broadly, because he is a pro se litigant, we also, we find that he has not, he has not articulated a prima facie case of eligibility for CAT protection. So I think my answer, in the long run way, is that the point is to read the board's decision, not just in the context of which the CAT claim was presented, but the entirety of its language. And the thought process of its analysis, where it starts with an effective assistance of counsel claim, and it says, okay, even if you're alleging a CAT claim beyond an effective assistance of counsel, we find that you don't, you're not, you haven't provided us enough with prima facie evidence for you to go forward and reopen the proceedings and pursue a CAT claim. Why is it a prima facie case that it's believable, he's not adversely credible, that the government agents threatened him with execution and they actually killed someone in his presence, to make that a known fact, and there's nothing to the contrary, and he's found credible, and that they threaten that if they don't adhere to his, to the agent's desires, he's going to suffer the same fate. Why wouldn't that be a prima facie case of CAT? To me it's, it would be a classical example of CAT if it's uncontested. Well, CAT is different than asylum and withholding. Even if Mr. Torton had shown that that incident amounted to torture, past torture is not, it does not create... It doesn't give rise to the presumption that you get. Right, it doesn't create a presumption of likelihood of future torture. Why not? Why not? It's the way the regulations and the, that's the way the regulations and the agreements were prepared. Which means that without presumption, he has to show more. He can't simply rely on the person... Well, why doesn't he have that here? He has demonstrated, and he's found to be credible, that he's threatened, if he doesn't adhere to a certain course of conduct, which is illegal, that he will be executed just like, and I'll show you here, I'm going to kill this guy right over here. Well, again, even if that arose to past torture, he has to show perspective that there's a likelihood, and the way the courts have looked at that, and the way the board has looked at that, is to look at the background materials, the country report, as it's in Exubita, where it showed that rape was prevalent, and that is what allowed the court to say, okay, here there is evidence of a likelihood, it's perspective. That type of information is not present in Mr. Torton's claim. But it's happened in the past. He's found credible that they did this in the past, in his presence, in a threatening way to him, and this is not future. This has happened in the past, and could it be assumed that's going to happen to him if he's returned? It's uncontested. We can't just assume. Mr. Torton had to show that there was a reasonable likelihood that it was more likely than not. Well, but it has some weight. The point of Judge Cowen's question, even in the absence of a presumption, you've still got evidence that a fact finder needs to consider, and from which you might derive some predictive value as to something that might happen in the future, right? I mean, that's consistent with your position that what has to be done is show in the future what would likely occur. Right, and the board certainly considers past torture. It doesn't, in and of itself, is not sufficient to show a likelihood of future torture. And again, the record here doesn't... All you have on that is that this happened in the past. It's credible. They threatened in the past with being killed, and you say that's not a prima facie case sufficient to at least go to a hearing, that if they return me it will happen to me again? No. If anything, that's evidence of past torture, and he has to show perspective. Well, but if it's happened in the past, there's a presumption it will happen in the future. No. Well, why can't it be? If it's nothing to the contrary, why does he have to prove that it's definitely going to happen if they return me? Well, I have to say, I don't show that there's nothing to the contrary. Again, Mr. Torture provided a lot of documentation, one of which was from an organization... Counsel, isn't the point that it remains his burden as opposed to an asylum claim, for example, where you do get the benefit of the presumption? The practical effect of a presumption is it shifts the burden of going forward with evidence. That's not what would exist here in the Catt claim, so Mr. Torshin continues to have to carry the ball in terms of being able to show that prima facie. What else does he need to show? He's got the country reports where torture is a definite possibility if it's returned. Well, you know, we would disagree with that. If the court looks at the... And he did provide a lot of documentation. There's documentation that deals with his sexual orientation, and there's ample evidence that there's discrimination, but that doesn't amount to torture. There is a section that deals with the treatment of business entrepreneurs, and it's a closed economy, and there's serious bureaucracy that businessmen have to go through, but that doesn't amount to torture. As I indicated earlier, the government is not particularly fond of political opponents, but Mr. Torshin doesn't fit into that category either. And I guess let me back up in a second and say this court in Lee actually also dealt with death threats, and threats it found, and this was in the context of past persecution, it says for past persecution, it has to be highly eminent and menacing in nature in order to constitute persecution. Torture, of course, is well above that. It has to be an extreme form of cruel and inhumane treatment. So I think Mr. Torshin failed in both regards, one in which he didn't allege conduct that was sufficiently severe, and the background material that he submitted... Could be more severe than I'm going to blow your head off. The court has generally found that death threats do not even necessarily rise to the level of persecution, let alone torture. We're not dealing with persecution here, we're dealing with cat. Didn't we hold that rape constitutes torture or can constitute torture? You did in Zubida, and there there was ample background material that showed that it was prevalent, and it had happened to her. That's my point. Doesn't this gentleman deserve a hearing so that he can try to prove that? All I'm suggesting to you is that he have an opportunity to say that under Zubida, I can win my case, and the reason I'm entitled to reopen is because I'm not merely challenging my conditions of confinement like an august challenge. I'm making very specific allegations about what is likely to happen to me if I am returned to Belarus. Give me that opportunity to prove up that case. Mr. Torshin's cat claim came up in the context of a motion to reopen, which are disfavored, and it was his burden to present evidence sufficient for the board to find that it was worthwhile to go forward. And if the board had said your evidence is insufficient, you lose. I'm with you. But the board didn't say that. The board said you merely are challenging conditions of confinement, and I'm looking at this record saying, wait a minute, he didn't challenge conditions of confinement. And again, we believe that the court has to read the board's decision both in the context in which it was presented and the totality of its analysis, which also has his ineffective assistance of counsel claim, which is how he initially raised his cat claim. So for those reasons and the reasons we set forth in our brief, we ask that the court sustain the decisions of the board. Thank you. Thank you. Rebuttal, Ms. Schweitzer. Thank you, Your Honors. Ms. Boeschke just indicated that, in general, motions to reopen are disfavored, and we're mindful of the fact that in an immigration context, courts do not want to give immigrants, you know, second, third, fourth bites at the apple to prove their claims, but that's not what's happening here. Mr. Torshin's motion to reopen was about getting a first real bite at the apple, about getting a chance to prove their claims. It was the advent of a full hearing to show that the past torture he had alleged and the future torture that he feared made it more likely than not that he would be tortured upon his return to Belarus. So that's really what it's about, is that he did show enough. Yes, there's no presumption based on the past torture, but it's certainly relevant. And as Judge Cowen said, it's a very severe death threat, and unlike cases where there's just a threat, this was menacing, this was severe, because it happened imminently after the brutal, grotesque death of an unknown man. So it was not just cornering someone in a hallway and saying, we're going to kill you. It was, you know, look at what we do to people. This is what we're going to do to you. We believe that that makes it more than just a death threat and it rises to the level of torture. Someone close to you. They made clear they weren't threatening him directly. They said they were going to hurt his loved ones or people close to him. Right, and under the regulations, I believe that torture is, you know, prolonged mental stress or pain at the imminent death of another with the bodyguard qualifying as the other in this situation. I may be asking you to prove a negative, and I apologize if I am, but your opposing counsel is suggesting that I'm taking these quotations that I've given her about the BIA's analysis with respect to conditions of confinement and corrupt individuals and not reading them holistically. Can you address that? Can you explain or prove that that is, in fact, the sole basis of the BIA's decision, or is that something that you can only suggest inferentially? Right, I think that the latter is true, is that we have nothing more to go on. There was really very little insight into what had been considered. There was no mention of, you allege this past torture, this incident in the woods, and this doesn't even rise to the level of torture, essentially shooting down the best evidence. We really have no indication as to what was considered, and the only pronouncements we do have don't seem to square with the record. We would agree with you that it's not just conditions of confinement as with the cases in Haiti, that there's a specific direction, this use of press camera, direct government involvement, repeated rape and abuse would surely rise to the level of torture. There's just no indication that that was even considered, not to shoot it down. And if the agency had made an adverse credibility determination or the agency took all this bundle of facts and said, in my view, it doesn't rise to the level of torture, you would have to climb that mountain of showing substantial evidence. But as I understand your argument, you're not saying that here. You're saying that it was an abuse of discretion from the BIA to mischaracterize the record in the fashion that it did. Right, both with respect to the point about no corrupt individuals and the point about just mere conditions of confinement, that neither squares with the record. With little else to go on, I mean, that's all that there is. We don't get any other insight into what was going on, just these mischaracterizations. We have nothing further. Thank you. Thank you very much. We thank counsel for their very powerful arguments in this matter. And we also note the nature of representation offered, Mr. Torshin, for which we thank counsel. That concludes the arguments for this morning. Now I have to reappear this afternoon. I'll ask the clerk to close court.